# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **MELVIN DIAS and EVELYN DIAS,** | ) | 1:09-CV-524  AWI DLB |
| | ) | |
| **Plaintiffs**, | ) | **ORDER ON DEFENDANT'S** |
| **v.** | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| **NATIONWIDE LIFE INSURANCE** | ) | |
| **COMPANY, an Ohio corporation, and** | ) | (Doc. No. 13) |
| **DOES 1 through 10,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

This case arises from the purchase of life insurance polices by Plaintiffs Melvin Dias ("Melvin") and Evelyn Dias ("Evelyn") from Defendant Nationwide Life Insurance Company ("Nationwide").  Plaintiffs allege a single claim of fraud and seek to recover *inter alia* over $400,000 in premiums.  Nationwide removed the case from the Fresno County Superior Court on the basis of diversity jurisdiction.  Nationwide now moves for summary judgment.  For the reasons that follow, the motion will be denied.

# **FACTUAL BACKGROUND**[1]

From 1996 to 2007, John Pena ("Pena") served as the Diases' financial advisor.  JUMF 5. During this time, Pena was a Florida resident, and Melvin spoke to him about twenty times per month.  JUMF 5, 7.  In his capacity as financial advisor, Pena provided Plaintiffs with advice regarding the sale of their family business as well as the purchase of stocks, bonds, mutual funds,

---

[1]"JUMF" refers to a joint undisputed material fact, "DUMF" refers to Defendant's undisputed material fact, and "PUMF" refers to Plaintiff's undisputed material facts.  The Court appreciates the parties's use of JUMF's.

real estate, IRA's, and life insurance.[2]  JUMF 6.  Plaintiffs had a relationship of trust and confidence with Pena.  PUMF 1.  Pena introduced Plaintiffs to foreign real estate investments and their families took vacations together.  See id.

In late summer or fall of 1998, Plaintiffs, who resided in Fresno, California, notified Pena that they were interested in purchasing life insurance for estate planning purposes in the event of their deaths.  JUMF 1, 8.  At that time, Plaintiffs had invested around $4 million through Pena.  JUMF 9.  Melvin, Pena, and Harvey Stein, an insurance agent of Nationwide, spoke about life insurance policies offered by Nationwide.  See Dias Dec. ¶¶ 5-6; Pena Depo. at 29:1-30:10.  According to Melvin, Pena told him that the Nationwide policy was "kind of like an investment policy" which would be "hooked in with the stock market, like I guess you might equate it with a mutual fund."  JUMF 10.  Melvin claims that Pena told him that the "monies [in the policy] would . . . generate additional income, income to take care of the insurance premiums . . ." because the "stock would grow and basically increase in value."  JUMF 13.  Melvin also claims that Pena said that the policy was a "good policy" because it would "grow in time," and that by paying premiums for two years, such investment would be "sufficient" to sustain the policy over Melvin's life.[3]  See JUMF 14.  Although Pena never told Plaintiffs what the anticipated rate of return would be on the policies, see DUMF 8, Melvin declares that Pena told him that the Policies were like a good investment and that Melvin would have the choice of putting more money into this investment if he so chose.  See Dias Dec. ¶ 6.

Upon Pena's recommendation, Plaintiffs decided to purchase Nationwide variable life insurance policies with death benefits of $5 million each.  JUMF 18.  According to Plaintiffs, Pena told them that, for Melvin's policy, they would only have to make two annual premium payments of $98,050 and thereafter the policy would be self-funding.  JUMF 19.  As for Evelyn's policy, Plaintiffs claim that Pena told them that they would only have to make two annual premium payments of $96,319.30 and thereafter the policy would be self-funding.  JUMF 20.  In

---

[2] Plaintiffs also utilized the services of *inter alia* lawyers, accountants, and stock brokers in their business and financial affairs, and did so in 1998.  JUMF 3.

[3] It is unclear precisely when or how often Pena made these statements to Melvin.

other words, Plaintiffs claim that Pena told them that the policies were like good retirement investments and that after two annual payments, the policies would pay for themselves. PUMF 3; see also Dias Dec. ¶ 6 (". . . the policy would generate its own premiums, and I would not be required to make any additional out-of-pocket payments.").[4]

Melvin understood that the Policies would increase with time because they would increase along with the stock market and generate additional revenues. See JUMF 11. Melvin stated that he did not understand that the Policy values could decrease if the stock market decreased because in 1998 the predictions for the stock market were all "upside." See JUMF 12. Melvin did not think of a "downside," if for example the stock market went down, but instead just believed that the Policies would go up as they were investment policies. See JUMF 15. Plaintiffs did not consult their accountants or lawyers prior to purchasing the Policies. JUMF 17. Other than purchasing a whole life policy several years earlier, Plaintiffs had no other experience with or knowledge of life insurance, including variable universal life policies. See PUMF 5.

On November 2, 1998, Melvin and Evelyn each applied to Nationwide for variable life insurance policies with $5 million face amounts ($10 million total). JUMF 22, 23. Melvin and Evelyn submitted separate applications. See Ison Exhibits A, C. Melvin admits that he read the application before he signed it. JUMF 24. Evelyn left all financial decisions to Melvin and had nothing to do with the purchase of the Nationwide policies, other than signing her name to the application and other required forms. JUMF 25.

On Melvin and Evelyn's applications, in response to Section 10, they indicated that planned annual premiums of $98,050 for Melvin and $96,319 for Evelyn. JUMF 26, 27. On both of the applications, at Section 12 (entitled "suitability"), the following questions were answered "yes": "A. Do you understand the death benefit and surrender value may increase or

---

[4] Pena, however, denies making these statements to Plaintiffs and instead testified that he told Plaintiffs that they would have to pay premiums each and every year and that Plaintiffs understood this. JUMF 21, 62. Pena also testified that he and Harvey Stein provided Plaintiffs illustrations regarding various projections for the Policies. See DUMF 4, 5, 6, 7. However, Plaintiffs deny receiving these illustrations. See Melvin Dias Dec. ¶ 21. Since Plaintiffs are the non-moving parties, the Court will credit their version of events. See Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003). For purposes of this motion, Plaintiffs did not receive the illustrations and Pena did tell Plaintiffs that they would only need to make two premiums payments because thereafter the Policies would generate their own premiums. See Dias Dec. ¶¶ 6, 21.

3

decrease depending on the investment experience of the variable account?  B.  Do you believe that this policy will meet your insurance needs and financial objectives?  C.  Have you received a current copy of the prospectus?"  JUMF 28; see also DUMF 9, 10.  Nationwide would not have issued the Policies if Plaintiffs had not answered these questions "yes" and signed the applications.  DUMF 11.  Application § 24 is entitled "IMPORTANT NOTICE" and reads:

> I understand that the Death Benefits under a Variable Life Insurance Policy may increase or decrease, depending on the investment return of the subaccount I select.  Regardless of any investment return, the Death Benefit can never be less than the Specified Amount as long as the policy is in force.  The Contract Value may increase or decrease on any day, depending on the investment return for the Policy.  No minimum Contract Value is guaranteed.  On request, we will furnish illustrations of benefits, including Death Benefits, and Contract Values for a Variable Life Insurance Policy and a Fixed Life Insurance Policy for the same premium.

JUMF 29.  Finally, above the signatures is the "Agreement, Authorization, and Signatures" section, which contains the following language, "I have read this Application.  I understand each of the questions.  All of the answers and statements on the form are complete and true to the best of my knowledge and belief.  I understand and agree that: 1.  This application as well as any forms the Company designates as part of the application, including any related medical questionnaire signed by me, will become part of the Policy and are the basis of any insurance issued upon this application . . . ."  JUMF 30.  Pena's signature appeared as agent on each application.  See Ison Dec. Exhibits A, C; PUMF 6.

Around the time of the application, Pena presented Plaintiffs with letters to sign, which requested that Pena be the representative on the Policies.  See Melvin Dias Supplement Dec. ¶ 4 & Exhibit B.  Melvin and Evelyn each signed the letters, which were dated November 3, 1998.  See id. at Exhibit B.  When Pena presented the letters to Plaintiffs, Melvin believed that Pena was a Nationwide agent, although he believed that Stein was the agent who sold the Policies.  See id. at ¶ 4.[5]

---

[5]Nationwide objects that Melvin's contention that he believed Pena spoke for Nationwide is contrary to Melvin's deposition.  At the deposition, Melvin declared that he believed that Stein was Nationwide's agent and Pena was his financial advisor.  In response to the objection, Melvin explained that he believed that the questions were directed towards the beginning of the sales process.  See Melvin Dias Supplemental Dec. ¶ 3.  The Court does not find the explanation so contrary to the deposition that it is a "sham."

On November 9, 1998, Nationwide approved Plaintiffs' respective applications and issued separate policies (hereinafter "Policies"), one to Melvin and one to Evelyn. See JUMF 31. The Policies each provide for an initial specified amount of $5 million. JUMF 32; DUMF 12, 14. Nationwide mailed the Plaintiffs' Policies to them at the address listed on their applications. DUMF 13, 15. Melvin received the Policies, but does not remember reading them. See Dias Dec. ¶ 9; JUMF 59.

The Policies provided that the premium mode was "annual." JUMF 33, 37. Melvin's Policy indicated that the "scheduled premium" was $98,050, and Evelyn's policy indicated that the "scheduled premium" was $96,319. JUMF 34, 35, 37. The first page of each Policy states:

> PLEASE READ YOUR POLICY CAREFULLY . . .
> The Cash Surrender Value of this Policy will vary from day to day. It may increase or decrease depending on the investment experience of the Policy. Refer to the Non-Forfeiture Provisions on page 11 for details. There is no guaranteed Cash Surrender Value.
>
> The amount of the death benefit may be variable and depends on the investment experience of the Policy. The duration on the death benefit will be variable and depend on the investment experience of the Policy. The death benefit will never be less than the specified amount as long as your Policy is in force. Refer to the Death Benefit Provisions.
>
> RIGHT TO EXAMINE POLICY
> You may return this Policy to us within [10 or 45 days depending on circumstances]. . . . The return Policy will be treated as if we had never issued it, and we will pay you the amount specified for the laws of the state in which the Policy was issued.
> ***
> FLEXIBLE PREMIUM VARIABLE UNIVERSAL LIFE INSURANCE POLICY
> – Adjustable Death Benefits
> – Flexible Premiums payable during Insured's lifetime and until the Maturity Date
> – Death Proceeds payable at Insured's death prior to the Maturity Date
> – Maturity Proceeds payable on the Maturity Date
> – Not eligible for dividends
> – Investment experience reflected in benefits.

JUMF 36. Pena testified that he spoke to Melvin the day Melvin received the Policies in the mail and they specifically discussed the 10-day "free look" provisions of the Policies. See DUMF 16, 17.[6] Plaintiffs did not return the Policies within 10 days, or otherwise. See JUMF 60. On page 2

---

[6] Plaintiffs dispute DUMF 17 by stating that they do not believe they ever discussed the 10-day "free look" provision. Plaintiffs cite Paragraph 9 of Melvin's declaration. However, Paragraph 9 states that Melvin received the Policies (although he does not specifically remember receiving them), he does not remember reading the Policies,

5

of the Policies, after identifying the initial premium ($98,050 for Melvin and $96,319 for Evelyn), the scheduled premium (the same amounts as the initial premium), and the premium mode (identified as "annual"), the Policies state, "Coverage may expire prior to the dates shown if the premium requirements in the Guaranteed Policy Continuation Provision are not met. Please see 'Guaranteed policy Continuation and Grace Period Provision." JUMF 37.  Page 6 of the Policies provided:

ENTIRE CONTRACT:

The entire contract consists of this Policy, any attached riders or endorsements, and the attached copy of any written application, written supplemental applications.  No agent, registered representative, or other person may change this Policy or waive any of its provisions.  Any agreement to alter this Policy must be in writing, signed by our President or Secretary and attached to or endorsed on your Policy.  We will not be bound by any promised representation made by any agent or other persons.

JUMF 39.  Page 9 of the Policies states:

Premium payments: The Initial Premium is due on the Policy Date.  It will be credited on the Initial Investment Date.  Any due and unpaid monthly deductions will be subtracted from the Cash Value at this time.  Insurance will not be effective until the Initial Premium is paid.  The Initial Premium is shown on the Policy Data Page.

Premiums other than the Initial Premium may be paid at any time while your Policy is in force subject to the limits described below.  Premium payment reminder notices will be furnished upon request.  We will send them according to the premium mode shown on the Policy Data Page.  You may pay the Initial Premium to us at our Home Office or to an authorized agent.  All premiums after the first are payable at our Home Office.  Premium receipts will be furnished upon request.

JUMF 40.  Finally, page 13 of the Policies states:

CONTINUATION OF INSURANCE

Insurance coverage under your Policy and any benefits provided by riders will continue in force until the Cash Surrender Value is insufficient to cover any policy charges which are due but unpaid as provided by the Grace Period Provision.  This provision will not continue your Policy beyond its Maturity Date.

The Planned premium together with any additional premium payments may not continue the Policy in force until the Maturity Date even if these amounts are paid as planned and no further changes take place.  The period for which the Policy will continue will depend on:

1. The planned premiums and the timing and amount of additional

and the copy of the Policy submitted in this motion by Nationwide matches his own copy.  <u>See</u> Dias Dec. ¶ 9.  Paragraph 9 makes no reference to the "free look" provision, to discussions with Pena, or to discussions with Pena about the "free look" provision.  DUMF 17 is undisputed.

premium payments;
2. Changes in the specified Amount and death benefits options;
3. Investment experience of the Policy;
4. Change in monthly cost of insurance charges and other policy charges;
5. Change in the cost of additional benefits provided by riders, if any; and
6. Policy loans.

JUMF 41.

The agent of record for Plaintiffs' Policies was Pena. DUMF 1. Pena has never been an employee of Nationwide, but in 1998 was an independent contractor appointed to sell Nationwide policies. DUMF 2; see also JUMF 58. A Nationwide employee has declared that Nationwide authorized Pena to solicit applications on behalf of Nationwide, but did not authorize Pena to accept risks or contracts or bind Nationwide. See DUMF 3. At the time Pena sold the Nationwide Policies to Plaintiffs, he was a licensed life insurance agent. See JUMF 57; see also See Pena Depo. at 19:4-20:13.[7] After the Policies were issued, Nationwide sent periodic statements to Plaintiffs that identified Pena as the representative for the Policies. PUMF 7. Plaintiffs would also receive periodically letters from Nationwide which encouraged them to call their representative if they needed additional information. PUMF 8. In 2002, at Pena's request, Plaintiffs signed a change of agent form for Nationwide due to the fact that Pena had changed brokerage firms. PUMF 9.

On November 9, 1998, Plaintiffs paid premiums of $98,050 and $96,318.61 to Nationwide. See JUMF 42, 43. On December 27, 1999, Plaintiffs paid premiums of $98,050 and $96,319.30 to Nationwide. See id.

Melvin received a premium notice from Nationwide in November 2000. See JUMF 44; PUMF 11. Melvin contacted Pena and asked Pena what the notice was for. PUMF 11. Pena told Melvin that Melvin did not need to pay the premiums since there was plenty of money in the policies. JUMF 44; PUMF 11. Upon Pena's advisement, Melvin chose not to make a payment. PUMF 11. Melvin continued to receive premium notices from Nationwide on an annual basis, but did not make payments in 2001, 2002, and 2003 based on Pena's representation to Melvin in

---

[7]Pena testified that he had been licensed to sell life insurance in California, that he was "probably"licensed in California before selling the Policies, and that he had been appointed by Nationwide to sell policies at the time he sold the Policies. See Pena Depo. at 19:4-20:13.

7

2000.  See JUMF 46; PUMF 12.  Melvin did not pay any premiums in 2001 because he believed that the funds in the account were taking care of any premiums.  See JUMF 45.

In late 2004, Melvin received another premium notice.  JUMF 47; PUMF 13.  Melvin called Pena and asked whether this was something Melvin should pay.  PUMF 13.  Pena told Melvin, "If you want to pay it, pay it, if not, don't."  JUMF 47; PUMF 13.  Melvin understood this to be consistent with the prior representation that he always had a choice whether to pay money into this investment.  PUMF 13.  It also occurred to Melvin that there may have been a miscalculation in the original premium billings.  See id.  Melvin decided to make a payment of $10,357.47 to Nationwide, in part because he thought of a miscalculation and in part because he thought the Policy was a good investment.  See JUMF 48; PUMF 13.

In 2005, Melvin received another premium notice and again thought that there was a miscalculation and that he needed to add to the investment again.  JUMF 49.  Dias did not call anyone at Nationwide about the assumed "miscalculation" because he had "relied on" Pena.  See id.  As such, he made another payment.  See JUMF 42.

In 2006, Melvin also paid additional premiums after receiving two premium notices because he again thought "it was a miscalculation and that [he] needed to add to the investment."  JUMF 50; see also JUMF 42.

In 2007, Melvin received premium notices from Nationwide and paid additional premiums because he thought there was a miscalculation.  JUMF 51; see also JUMF 42.  In the Spring of 2007, Melvin contends that he discovered that Pena had been stealing money from him and then changed brokers.  See PUMF 16.[8]  Another brokerage firm told Melvin that he had been the victim of a "vanishing premiums" fraud.[9]  See id.

---

[8] Nationwide states that whether Pena stole money is irrelevant, Pena denies that he stole anything, and Pena's alleged theft is the subject of a separate case before District Judge Wanger of this district.  At this time, the Court will not consider whether Pena was stealing.  For this motion, it is enough that Melvin went to another firm.  Additionally, the case before Judge Wanger was closed in October 2008 upon a stipulated dismissal (the parties agreed to arbitration).  See Courts Docket Doc. Nos. 52, 53 in case 1:08-CV-171 OWW SMS.

[9] Nationwide objects that the assertion regarding "vanishing premiums fraud" is based on inadmissible hearsay.  However, the Court is not considering the evidence for the truth of the matter asserted, that is, the Court is not considering the statement to be evidence that Melvin was in fact the victim of vanishing premiums fraud.  See Fed. R. Evid. 801(c).  The statement from the other broker is considered in context of the statute of limitations.

Pena never told Melvin that there was a "miscalculation," rather Melvin just assumed that there was. JUMF 52. However, despite the fact that Melvin and Pena spoke regularly, Pena never told Melvin that there was any kind of problem with the Policies. PUMF 15. Further, Plaintiffs did not receive premium notices on Evelyn's policy until 2008, which further led Melvin to believe that the original representation regarding the fact that the Policies would pay for themselves was true. See PUMF 14; DUMF 19. Melvin declared that he believed Pena's representations and would not have bought the policies if he had known that the premiums of nearly $100,000 per policy would be required beyond the first two years. See PUMF 4.

On May 6, 2008, Melvin and Evelyn took out loans on their Policies for $2,743.16 and $32, 227.16, respectively. JUMF 53, 54.

Melvin's Policy lapsed effective July 9, 2008, due to non-payment of premiums. JUMF 55. Nationwide had sent two lapse notices in 2004, four lapse notices in 2005, four lapse notices in 2006, four lapse notices in 2007, and three lapse notices in 2008, all reminding Melvin to pay premiums on the Policy. DUMF 18. Evelyn's Policy lapsed effective September 8, 2008, due to non-payment of premiums. JUMF 56. Nationwide had sent Evelyn lapse notices in July, August, and September 2008, reminding her to pay premiums on her Policy. DUMF 19.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings

Assn, 322 F.3d 1039, 1046 (9th Cir. 2002). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Anderson, 477 U.S. at 248; Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. Soremekun, 509 F.3d at 984. Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim. See James River Ins. Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008); Soremekun, 509 F.3d at 984; Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000). If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th Cir. 2000). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire & Marine, 210 F.3d at 1103. The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. Pro. 56(e)).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004). "A genuine issue of

material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002). Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'" Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006). Additionally, the court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references. See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment. See Nissan Fire & Marine, 210 F.3d at 1103.

## DEFENDANT'S MOTION

Nationwide relies on three bases to support its motion for summary judgment. The Court will address each basis separately.

### 1. Reasonable Reliance

*Defendant's Contention*

Nationwide argues that Plaintiffs' fraud claim fails because they cannot show justifiable reliance on the alleged misrepresentations of Pena. California courts have ruled that there is no reliance on representations when the representations are contrary to the express terms of the policy. Where an insured accepts a policy without reading it, the insured cannot complain that the policy was not what they expected. Plaintiffs were under a duty to read the policy, but did not do so. The Policies clearly and conspicuously provided that premiums were due and payable each and every year. Further, the Policies had a 10-day "free look" period, and if the Polices were not what Plaintiffs expected, the Policies could have been cancelled in the period of time

and their premiums could have been refunded.  Additionally, the Policies contain an express integration clause, which prevents the introduction of extrinsic evidence of pre-purchase representations regarding the number of premium payments that are contrary to the terms of the Policies.  Pena's representations regarding the number of policy payments flatly contradicts the terms of the applications and the Policies.  Finally, Plaintiffs admit that they thought of the Policies as an investment and that their values would fluctuate with the stock market, but did not consider any "down side."  There is no reasonable reliance.

### *Plaintiffs' Opposition*

Plaintiffs argue that justifiable reliance is generally a question of fact and is evaluated in light of a plaintiff's own information and intelligence.  The state cases relied upon by Nationwide do not deal with "vanishing premium" situations.  In a recent case involving "vanishing premium" fraud (*Broberg*), the California court of appeal refused to dismiss a fraud claim because nothing in the policy language made reliance on the agent's representations unreasonable.  The only language that could have arguably placed Melvin on notice that annual premiums could be required after two years is buried in small print.  However, it could still be found that Melvin reasonably relied on the specific representations of the Pena.  Under the rationale of *Broberg*, summary judgment is inappropriate.

### *Legal Standard*

#### Fraud

The "elements of fraud are: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage."  Robinson Helicopter Co., Inc. v. Dana Corp., 34 Cal.4th 979, 990 (2004); Alliance Mortgage Co. v. Rothwell, 10 Cal.4th 1226, 1239 (1995).  "Reliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other transaction."  Alliance, 10 Cal.4th at 1239; Manderville v. PCG&S Group, Inc., 146 Cal.App.4th 1486, 1498 (2007).  Whether reliance on a representation

is "justifiable" or "reasonable" is determined in light of the plaintiff's own knowledge and experience.  See Alliance, 10 Cal.4th at 1240; Broberg v. Guardian Life Ins. Co. of Am., 171 Cal.App.4th 912, 921 (2009); Manderville, 146 Cal.App.4th at 1499.  "Only '[i]f the conduct of the plaintiff [in relying upon a misrepresentation] in the light of his own intelligence and information was manifestly unreasonable' will he be denied recovery."  Broberg, 171 Cal.App.4th at 921 (quoting Hefferan v. Freebairn, 34 Cal.2d 715, 719 (1950)); Cicone v. Urs Corp., 183 Cal.App.3d 194, 205-06 (1986).  "Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact."  Alliance, 10 Cal.4th at 1239; Manderville, 146 Cal.App.4th at 1498-99.  Reasonable reliance "may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts."  Alliance, 10 Cal.4th at 1239; Broberg, 171 Cal.App.4th at 921; Manderville, 146 Cal.App.4th at 1499.

Parol Evidence of Fraud

The parol evidence rule "generally prohibits the introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms of an integrated written instrument." Casa Herrera, Inc. v. Beydoun, 32 Cal.4th 336, 343 (2004); see also Cal. Code. Civ. Pro. § . "'Integration' means the extent to which a writing constitutes the parties' final expression of their agreement."  Esbensen v. Userware Internat., Inc., 11 Cal.App.4th 631, 636 (1992).  By statute, parole evidence is admissible "to establish illegality or fraud."  Cal. Code Civ. Pro. § 1856(g). "Fraud in the inducement renders the entire contract voidable, including any provision in the contract providing the written contract is, for example, the sole agreement of the parties, that it contains their entire agreement and that there are no oral representations."  Hinesley v. Oakshade Town Center, 135 Cal.App.4th 289, 301 (2005); see also Bell v. Exxon Co., 575 F.2d 714, 715-16 (9th Cir. 1978).  However, California's "conception of the rule which permits parol evidence of fraud to establish the invalidity of the instrument is that it must tend to establish some independent fact or representation, some fraud in the procurement of the instrument or some breach of confidence concerning its use, and not a promise directly at variance with the promise of the writing."  Bank of Am. Nat'l Trust & Sav. Ass'n v. Pendergrass, 4 Cal.2d 258, 263 (1935);

see Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc., 971 F.2d 272, 281 (9th Cir. 1992); Casa Herrera, 32 Cal.4th at 346-47. Stated differently, if a "false promise is either independent of or consistent with the written instrument," and does not contradict the express terms of an integrated document, the § 1856(g) fraud exception applies. Wang v. Massey Chevrolet, 97 Cal.App.4th 856, 873 (2002); Alling v. Universal Manufacturing Corp., 5 Cal.App.4th 1412, 1426 (1992).

### Discussion

Nationwide's first argument is based on Plaintiffs' failure to read the Policies and the Policies' language. A line of California cases recognize that an insured is under a duty to read his insurance policy, and the insured will be charged with constructive knowledge of policy provisions which are plain, clear, and conspicuous. See Spray, Gould & Bowers v. Associated Internat. Ins. Co., 71 Cal.App.4th 1260, 1272 (1999); Hadland v. NN Investors Life Ins. Co., 24 Cal.App.4th 1578, 1586 (1994). Such knowledge or constructive knowledge may defeat the element of "justifiable reliance. See id. However, these cases have been distinguished. It has been held that, when there is no dispute regarding the policy terms or their meaning, but instead the dispute concerns an agent actively misleading an applicant/insured as to the effect of the policy terms, then the holding of cases like *Hadland* do not apply. See Paper Savers, Inc. v. Nacsa, 51 Cal.App.4th 1090, 1102 (1996); see also Broberg, 171 Cal.App.4th at 923. When the misrepresentations are not inconsistent with the terms of an insurance policy, reliance on the misrepresentations may still be "justifiable." See Broberg, 171 Cal.App.4th at 923.

Nationwide cites several provisions of the Policies, but expressly relies on the 10-day "free look" provision and the provision of the Policies that states the mode of the premiums was "annual."[10] See Court's Docket Doc. No. 13 at 15:11-13; see also JUMF 36, 37. However, Plaintiffs do not contend that premiums were not due, rather they contend that they were told that the Policies would generate their own premiums after two years of premium payments. See

---

[10]The Court assumes this is the provision relied upon. The memorandum only states, "The Policies clearly and conspicuously provided that premiums were due and payable each and every year." Court's Docket Doc. No. 13 at 15:11-12. The only provision that has been cited to the Court that would seem to fit this description is on the "data page" wherein it is written that the "premium mode" is "annual." JUMF 37.

JUMF 13, 19, 20; Dias Dec. ¶ 6.  This is similar to *Broberg*.

In *Broberg*, the misrepresentation at issue was that an insurance policy would generate enough income to pay its own premiums after eleven annual premium payments.  See Broberg, 171 Cal.App.4th at 916-17.  In rejecting an argument that a policy provision that premiums were payable "for life" foreclosed reasonable reliance, the California court explained:

> However, Powell does not allege he was told premiums would stop, rather that premiums after the 11th year would be paid from earnings from the policy and that no further out-of-pocket payments would be required.  Accordingly, even though Powell may be charged with knowledge of the terms of the policy he received, nothing in the policy itself was inconsistent with the misrepresentations on which the lawsuit is based.  See Paper Savers, Inc. v. Nacsa (1996) 51 Cal.App.4th 1090, 1102 ("The instant case has nothing to do with the interpretation of insurance policy terms. No one is disputing the policy terms or their meaning. The dispute is whether [the insurer's agent] actively misled [the insured's representative] as to the effect of those terms.").)

Id.  The same is true in the case at bar.  Assuming that Plaintiffs had constructive knowledge of the Policies' terms, Nationwide has not shown the Court a clear Policy provision that is contrary to Pena's misrepresentation.  The Court does not see that the Policies' language (as presented in Nationwide's arguments) makes Melvin's reliance unreasonable as a matter of law.

Nationwide's second argument is based on the parol evidence rule.  The Court reads Nationwide's argument as alleging that the Policies are fully integrated.  Plaintiffs make no argument regarding integration.  Assuming full integration, the parol evidence rule would foreclose evidence of a prior or contemporaneous agreement that contradicts or adds to the Policies.  See Cal. Code Civ. Pro. § 1856(b); Esbensen, 11 Cal.App.4th at 637.   However, fraud is an exception to the parol evidence rule.  See Cal. Code Civ. Pro. § 1856(g).  To be admissible, the misrepresentation "must tend to establish some independent fact or representation, some fraud in the procurement of the instrument or some breach of confidence concerning its use, and not [be] a promise directly at variance with the promise of the writing."  Pendergrass, 4 Cal.2d at 263; see also Brinderson-Newberg, 971 F.2d at 281; Wang, 97 Cal.App.4th at 873.  The misrepresentation at issue is that, after making two premiums, the Policies would generate sufficient income to pay their own premiums.  As discussed above, Nationwide has not shown that this representation is "directly at variance," that is contradicts, any of the Policies' terms.  Cf.

Broberg, 171 Cal.App.4th at 923 (holding that "nothing in the policy itself was inconsistent with the misrepresentation on which the lawsuit is based [i.e. the policies would generate their own premiums after 11 years of payments by the plaintiff]).[11] The misrepresentation seems to be independent of or consistent with the Policies.[12]  See Pendergrass, 4 Cal.2d at 263; Broberg, 171 Cal.App.4th at 923; Wang, 97 Cal.App.4th at 873; Alling, 5 Cal.App.4th at 1426.  Summary judgment on the basis of this argument is inappropriate.[13]

Finally, Nationwide's last argument is that Melvin did not consider that the market could go down.  However, the issue is whether Melvin's reliance on Pena's misrepresentations was "justifiable" or "reasonable."  Although Melvin's belief about the stock market may be "naive," that is simply one piece of evidence for the jury to consider in determining whether reliance in Pena's misrepresentation was "justifiable."  It does not tip the scale to the point that the Court can rule that reliance was unreasonable as a matter of law.

Justifiable reliance is normally a question of fact for a jury, and Nationwide has not shown this to be one of the "rare cases" in which there is only one conclusion that reasonable minds could reach.  See Alliance, 10 Cal.4th at 1239; Broberg, 171 Cal.App.4th at 921; Manderville, 146 Cal.App.4th at 1499.  Nationwide has not shown that either the language of the Policies, or Melvin's belief regarding the stock market, or a combination of both would make reliance on Pena's misrepresentations unreasonable as a matter of law.  See id.  Summary

---

[11] Nationwide seeks to distinguish *Broberg* by properly pointing out that misrepresentations in that case were made in a written and oral form, and the case was in the context of a demurrer, not summary judgment. However, in our case, Plaintiffs have alleged a clear oral misrepresentation by Pena and the Court does not see, nor does *Broberg* require, that there must also be a written misrepresentation. Also, that *Broberg* dealt with a demurrer is not troubling given the evidence that has been presented in this case. Like the allegations in *Broberg*'s complaint, the evidence presented to this Court does not show a contradiction/inconsistency between the misrepresentation and the terms of the Policies.  Cf. Broberg, 171 Cal.App.4th at 923 with JUMF 13, 19, 20, 37.

[12] Considering the relationship that Melvin had with Pena, the misrepresentation may also be a "breach of confidence."  See Pendergrass, 4 Cal.4th at 263.

[13] Nationwide relies heavily on *Jackson National*. In that case, the parol evidence rule defeated breach of contract claims.  In re Jackson Nat. Life Ins. Co. Premium Litig., 107 F.Supp.2d 841, 848-51 (W.D. Mich. 2000). The Michigan court also held, however, the it "acknowledges that the parol evidence rule may not bar extrinsic evidence of fraud in the inducement. Plaintiffs' fraud claims are distinct from the breach of contract claims and are addressed below."  Id. at 850 n.6. The court then granted summary judgment against the California plaintiff's fraud claim, not based on the parol evidence rule, but on the ground that the statute of limitations had run.  See id. at 852-53. Especially in light of *Broberg*, *Jackson National* does not control the resolution of Plaintiffs' fraud claim.

judgment on the basis of no "justifiable reliance" is inappropriate.

**2.      Vicarious Liability**

*Defendant's Contention*

Nationwide argues that Pena was Plaintiffs' agent.[14]  The evidence shows that Melvin went to Pena and requested that Pena find life insurance.  Under these circumstances, California courts hold that Pena would be the agent of Melvin, not Nationwide.  In this sense, Pena is more like an insurance broker and brokers are the agents of the insured.  However, even if Pena was acting as Nationwide's agent, Pena did not have the actual authority to make promises and representations on behalf of Nationwide.  At best, Pena would be a "soliciting agent," who was authorized only to solicit applications.  Such an agent only initiates contracts, but does not consummate them or bind the principal by anything he says or does during negotiations.  Also, the Policies contain an "entire contract" provision, the terms of which show that Nationwide is not responsible for Pena's conduct.[15]

*Plaintiffs' Opposition*

Plaintiffs argue that Pena was a licensed agent who was appointed by Nationwide.  Under the California Insurance Code, a life insurance licensee (like Pena) is one who is authorized to act on behalf of a life insurer.  The Insurance Code makes Pena Nationwide's agent as a matter of law, and thus, Nationwide is liable for Pena's misrepresentations.  Pena is not a "broker" since the Insurance Code specifically excludes life insurance agents from the definition of a "broker."  Nationwide is also responsible for Pena's conduct because it placed him in a position to commit the fraud.

*Legal Standard*

"An individual cannot act as an insurance agent in California without a valid license issued by the commissioner of insurance.  (Ins. Code, § 1631).  In addition to possessing a

---

[14]There is no issue regarding *respondeat superior* as the parties agree Pena was not Nationwide's employee.

[15]Nationwide also argues that there is insufficient evidence of a ostensible agency, to the extent that Plaintiffs may rely on this theory.  Plaintiffs dispute this argument.  However, because there are genuine disputes regarding Pena's authority as a soliciting agent, it is unnecessary to discuss ostensible agency at this point.

license, an insurance agent must be authorized by an insurance carrier to transact insurance business on the carrier's behalf. This authorization must be evidenced by a notice of agency appointment on file with the Department of Insurance. (Ins. Code, § 1704(a))." Krumme v. Mercury Ins. Co., 123 Cal.App.4th 924, 929 (2004); Loehr v. Great Republic Ins. Co., 226 Cal. App. 3d 727, 732–33 (1990). "Only 'life agents' are authorized to transact life insurance business, including annuity business." People ex rel. Bill Lockyer v. Fremont Life Ins. Co., 104 Cal.App.4th 508, 525 (2002). Under California law, a "life licensee is a person authorized to act as a life agent on behalf of a life insurer . . . to transact . . . life insurance . . . ." Cal. Ins. Code §§ 32(a), 1622(a).

The California Supreme Court has stated that an "insurance company can, like any other principal, prescribe limitations upon the power and authority of agents, and persons dealing with such agents with knowledge of the limitations upon their authority are bound by the restrictions imposed." Iverson v. Metropolitan Life Ins. Co., 151 Cal. 746, 751-52 (1907); see also 39 Cal.Jur.3d § 183.

> As a general rule the powers of an agent of an insurance company are governed by the general law of agency. His powers are varied by the character of the functions he is employed to perform. He may be a general agent with general powers, or his powers may be limited by the company; or he may be a special agent with authority limited to a specific transaction. In any event, an insurance agent, whether general or special, possesses such powers as have been conferred by the company, or as third persons have a right to assume that he possesses under the circumstances of the case; and as a general rule his powers, as to those dealing with him, are determined by the nature of the business entrusted to him and are prima facie coextensive with its requirements.

Frasch v. London & Lancashire Fire Ins. Co., 213 Cal. 219, 223 (1931); Skyways Aircraft Ferrying Service, Inc. v. Stanton, 242 Cal.App.2d 272, 281 (1966). "A soliciting agent is authorized by an insurer to sell insurance, receive applications, deliver policies, and collect premiums, however, has no authority to bind the insurer." 3 Couch On Insurance § 45:23 (3d ed. 2005); see also 43 Am. Jur. 2d Insurance § 146. That is, a soliciting agent has no authority to "make" or "consummate" a contract of insurance and thus, a soliciting agent does not bind an insurer into a contract of insurance during negotiations. See Duarte v. Postal Union Life Ins. Co., 75 Cal.App.2d 557, 571 (1946); Toth v. Metropolitan Life Ins. Co., 123 Cal.App. 185, 192

18

(1932); <u>Browne v. Commercial Union Assur. Co.</u>, 30 Cal.App. 547, 554 (1916).  However, a "soliciting agent's authority to procure applications, submit them to the company, and to deliver the policy embraces all incidental and naturally connected matter, and covers also negotiations prior to such delivery."  3 Couch On Insurance § 48:5 (3d ed. 2005); <u>cf.</u> <u>Frasch</u>, 213 Cal. at 223.  "A soliciting agent would be expected to have the power to explain the lines of insurance sold by the company, take applications, quote premium rates, and explain the terms and limitations of the insurer's products."  43 Am. Jur. 2d Insurance § 146; <u>cf.</u> <u>Frasch</u>, 213 Cal. at 223.

*Discussion*

Nationwide relies on *Eddy v. Sharp*, 199 Cal.App.3d 858 (1988), to argue that Pena was Plaintiffs' agent because Melvin asked Pena to select insurance.  The relevant issue in *Eddy* was whether the insured, Eddy, could hold the insurance agent, Sharp, individually liable for negligent misrepresentation.  <u>See</u> <u>Eddy</u>, 199 Cal.App.3d at 864.  The court of appeal stated that, "[i]f an insurance agent is the agent for several companies and selects the company with which to place the insurance or insures with one of the them according to directions, the insurance agent is the agent of the insured."  <u>Id.</u> at 865.  The court concluded that the Sharp owed a duty of care to Eddy under "agency principles."  <u>Id.</u>

The Court is not convinced that *Eddy* is controlling at this point.  First, the *Eddy* rule applies when an "insurance agent is the agent for several companies."  The evidence shows that Pena was an agent for Nationwide.  The evidence also shows that Pena was "probably" licensed as a life agent in California in 1998.  Critically, however, there is no evidence before the Court that Pena was an agent for any insurance companies besides Nationwide in 1998.  Since there is no evidence that Pena was an insurance "agent for several companies," the *Eddy* rule does not apply.

Second, *Eddy* has been distinguished on grounds that apply to this case.  In *Loehr v. Great Republic*, the court of appeal explained:

> The fact that Doyle was an "independent" insurance agent so licensed to transact insurance business for several different carriers did not insulate Great Republic from responsibility for Doyle's actions as its agent, or make appellant liable therefor.

The case of *Eddy v. Sharp* (1988) 199 Cal.App.3d 858, on which respondent relies for its contention that Doyle was appellant's agent rather than Great Republic's, is clearly distinguishable from the instant case. The court in Eddy was concerned with whether the defendant insurance agent or broker in question owed any duties to the consumer plaintiff. The case did not address the issue of whether the defendant's acts or omissions were binding on the carrier, or even whether the defendant in fact was an agent of the carriers he dealt with, as opposed to being an independent insurance broker. ( Id., at pp. 864-867.)

The evidence in the record establishes that Doyle was an agent of Great Republic. As such, his acts and omissions as agent were binding on respondent. ( Marsh & McLennan of Cal., Inc. v. City of Los Angeles (1976) 62 Cal.App.3d 108, 117) Of course, Doyle may perform acts outside his agency or in excess of his authority for which Great Republic would have no responsibility or liability, and there may be factual questions as to representations he made to the insured.

Loehr v. Great Republic Ins. Co., 226 Cal. App. 3d 727, 734 (1990).  The same analysis applies in this case.  The issue in this case is not Pena's liability to Plaintiffs, it is whether Nationwide may answer for Pena's misrepresentations regarding the Policies.

The evidence indicates that Pena was an agent for Nationwide in 1998, prior to the sale of the Policies to Plaintiffs.  See JUMF 57; DUMF 1, 3; Ison Dec. at ¶ 21; Pena Depo. at 19:4-20:13.  The declaration of Christopher Ison indicates that Pena was not a "general agent" of Nationwide, but instead appears to have been a "soliciting agent" with limited authority.  See Ison Dec. at ¶ 22; DUMF 1, 3; see also Court's Docket Doc. No. 13 at p.18:7-8.  As a soliciting agent, Pena could not bind Nationwide into a contract through the negotiation or explanation process.  See Duarte, 75 Cal.App.2d at 571.  However, generally speaking, soliciting agents naturally have the authority to do those acts, on behalf of the insurer, which further, and naturally arise from, their soliciting activities; this would seem to include an explanation of products and terms during the negotiation process.  See 3 Couch On Insurance § 48:5 (3d ed. 2005); 43 Am. Jur. 2d Insurance § 146; cf. Frasch, 213 Cal. at 223; cf. also Boggio v. California-Western States Life Ins. Co., 108 Cal.App.2d 597, 599 (1952) (noting circumstances in which the applicant properly relied on the representations of the soliciting agent to omitted information from application); Goldstone v. Columbia Life & Trust Co., 33 Cal.App. 119, 124-25 (1917) (noting that an applicant has a duty to rescind/notify insurer where the soliciting agent's wrongful representations induce the purchase of a policy and the policy does not match the representations).  Thus, although Pena could not make a binding contract or add a binding term

on Nationwide, he could fraudulently induce the purchase of a policy through his solicitation activities by misrepresenting the nature of a product or policy term. Why Nationwide would not answer for such fraudulent conduct is not clear at this point. See id. Assuming that Pena was a soliciting agent, the misrepresentations alleged would seem to fall squarely within the natural scope of authority of a soliciting agent.

Lastly, Nationwide also relies on the "integration clause" of the Policies. The relevant provision reads, "We will not be bound by any promised representation made by any agent or other persons." The Court understands Natinwide's reliance on this clause to be an argument that Pena exceeded his authority by making the specific misrepresentations. However, this very argument has recently been reject. The clause in *Broberg* read, "[the insurer] will not be bound by any promise or statement made by any agent . . . ." Broberg, 171 Cal.App.4th at 923 n.3. The *Broberg* court did not dismiss that plaintiff's fraud claim and instead held, "a party to an agreement induced by fraudulent misrepresentations or nondisclosures is entitled to rescind, notwithstanding the existence of purported exculpatory provisions contained in the agreement." Id. Without a better developed argument from Nationwide, *Broberg* defeats Nationwide's position. See id.

Summary judgment on the basis that Nationwide is not responsible for Pena's acts is not appropriate at this time.

### **3.** **Statute of Limitations**

*Defendant's Contention*

Nationwide argues that Plaintiffs have filed suit beyond the statute of limitations period. The evidence shows that Plaintiffs either knew or should have suspected that they had been defrauded from 2000 forward. In that time, Plaintiffs received notices from Nationwide stating that additional premium payments were due to keep the policies in force. Plaintiffs' allegations that they had been misled by Pena until 2007 does not save their claim since a "suspicion" of wrongdoing is all that is necessary. The latest date on which Plaintiffs' suspicions were or should have been aroused was 2000.

*Plaintiffs' Opposition*

Plaintiffs argue that the language of the Policies themselves were insufficient to place them on inquiry notice. Further, after Melvin received the premium notice in 2000, he made an inquiry to Pena, who advised Melvin not to worry as there was plenty of money in the account. Further, when Melvin spoke to Pena again in 2004, Pena said that Melvin could choose to pay or not pay. Where a defendant conceals the facts giving rise to a cause of action, the statute of limitations is tolled. Further, Pena had a fiduciary relationship with Melvin and Pena's failure to disclose the true nature of the policies tolls the statute of limitations. The language of the Policies and the conduct of Pena create disputes that can only be resolved by the jury.

*Legal Standard*

The statute of limitations for a fraud claim in California is three years. See Cal. Code Civ. Pro. § 338(d); Broberg v. The Guardian Life Ins. Co. of Am., 171 Cal.App.4th 912, 920 (2009); Alfaro v. Community Housing Improvement System & Planning Assn., Inc., 171 Cal.App.4th 1356, 1391 (2009). The limitations period for a fraud claim "is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." Cal. Code Civ. Pro. § 338(d); Alfaro, 171 Cal.App.4th at 1391. The limitations period for fraud thus incorporates the "delayed discovery rule." See Broberg, 171 Cal.App.4th at 920; Royal Thrift & Loan Co. v. County Escrow, Inc., 123 Cal.App.4th 24, 43 (2004). Under the delayed discovery rule, "a cause of action accrues and the statute of limitations begins to run when the plaintiff has reason to suspect an injury and some wrongful cause . . . ." Fox v. Ethicon Endo-Surgery, Inc., 35 Cal.4th 797, 803 (2005). Stated differently, "the limitations period begins once the plaintiff has notice or information of circumstances to put a reasonable person on inquiry." Jolly v. Eli Lilly & Co., 44 Cal.3d 1103, 1110-11 (1988). A plaintiff has reason to discover a cause of action when he "has reason at least to suspect a factual basis for its elements," that is the "generic elements of wrongdoing, causation, and harm." Fox, 35 Cal.4th at 803-04. Because "subjective suspicion" is not required, if "a person becomes aware of facts which would make a reasonably prudent person suspicious, he or she has a duty to investigate further and is charged with knowledge of matters which would have been revealed by such an investigation." McCoy

v. Gustafson, 180 Cal. App. 4th 56, 108 (2009). However, in cases involving a fiduciary relationship, "facts which would ordinarily require investigation may not excite suspicion, and [] the same degree of diligence is not required." Alfaro, 171 Cal.App.4th at 1394. Further, a "defendant's fraud in concealing a cause of action against him will toll the statute of limitations, and that tolling will last as long as a plaintiff's reliance on the misrepresentations is reasonable." Grisham v. Philip Morris U.S.A., Inc., 40 Cal. 4th 623, 637 (2007); Bernson v. Browning-Ferris Industries, 7 Cal.4th 926, 931 (1994). "Whether reliance [on the concealing fraud] was reasonable is a question of fact for the jury, and may be decided as a matter of law only if the facts permit reasonable minds to come to just one conclusion." Grisham, 40 Cal.4th at 637. Finally, "[w]hile resolution of the statute of limitations issue is normally a question of fact, where the uncontradicted facts established through discovery are susceptible of only one legitimate inference, summary judgment is proper." Romano v. Rockwell Internat., 14 Cal.4th 479, 487 (1996); Jolly, 44 Cal.3d at 1112; Broberg, 171 Cal.App.4th at 921. If the facts are susceptible to opposing inferences, the statute of limitations is a question for the trier of fact. See Cleveland v. Internet Specialties West, Inc., 171 Cal.App.4th 24, 31 (2009); Ralph Andrews Productions, Inc. v. Paramount Pictures Corp., 222 Cal.App.3d 676, 682 (1990).

*Discussion*

There is no doubt that Plaintiffs suspicions were raised at least in 2007 when they were told that they had been the victims of "vanishing premiums" fraud.[16] See PUMF 16. However, Nationwide argues that Plaintiffs' suspicions should have been raised in 2000 and forward because Melvin received notices that a premium was due. The Court admits that the number of payment notices that Melvin received from at least 2004 to 2008 is compelling evidence in Nationwide's favor. See DUMF 18. Nevertheless, the Court believes that there are other facts in Plaintiffs' favor that create a triable issue.

When Melvin received the premium notice in 2000, he contacted Nationwide's agent, Pena. Nationwide does not dispute that Pena was the agent for the policies, or that it sent papers

---

[16]This lawsuit was filed in state court on February 3, 2009. See Court's Docket Doc. No. 1. Obviously, if the three year statute of limitations begins running in 2007, then there is no statute of limitations problem.

23

to Plaintiffs from time to time that identified Pena as the agent and urged Plaintiffs to contact that agent if they had questions. See DUMF 1; PUMF 6, 7, 8, 9. Melvin did this in 2000 and Pena told Melvin that he did not need to pay the premium. JUMF 44. Similarly, when Melvin asked Pena about the premium notice he received in 2004, Pena told him that Melvin had the choice to either pay or not pay, see JUMF 47, which is not inconsistent with either the misrepresentations in 1998 or Pena's statement/answer in 2000. There is nothing to indicate that contacting Pena about this issue in 2000 and 2004 was inappropriate, and, given the confidential relationship between Melvin and Pena, reliance on Pena's statements without further investigation may have been reasonable. Cf. Alfaro, 171 Cal.App.4th at 1394. The statute of limitations is also tolled where a defendant fraudulently prevents discovery. See Grisham, 40 Cal. 4th at 637; Bernson, 7 Cal.4th at 931. Further, despite the 2000 premium notice, Melvin did not make a payment until 2004. Nationwide did not cancel the policy between 2000 and 2004, even though no funds were received. It was not until 2008 that the Policies were cancelled for "non-payment of premiums." See JUMF 55, 56. Finally, the Court finds it very significant that Nationwide did not send any notices of non-payment of premiums to Evelyn until 2008. See JUMF 19; PUMF 14. Nationwide has not explained why it did not issue payment notices to Evelyn until 2008, even though there is no evidence that any premiums were paid on Evelyn's Policy between 2000 and 2008. The Policies and applications were separate, and the premiums paid were separate although Evelyn's payments were slightly less than Melvin's. Nationwide's conduct towards Evelyn's Policy was perfectly consistent with Pena's representations, which lends support to Melvin's idea that there was some sort of miscalculation occurring at Nationwide.

Viewing this evidence in the light most favorable to Plaintiffs as the non-moving parties, the total weight of these facts and considerations could support the inference that Plaintiffs were not on inquiry notice from 2000 through 2007. As such, the Court cannot determine when Plaintiffs had "knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud, thus putting [them] on inquiry." See Cleveland, 171 Cal.App.4th at 31. Because the facts are susceptible to more than one legitimate inference, the issue of when the statute of limitations began to run is a question of fact for the jury, and summary judgment is not proper. See

Romano, 14 Cal.4th at 487; Jolly, 44 Cal.3d at 1112; Broberg, 171 Cal.App.4th at 921; Cleveland, 171 Cal.App.4th at 31.

## **CONCLUSION**

Nationwide moves for summary judgment on Plaintiffs' single cause of action for fraud. Summary judgment through the absence of justifiable reliance is not appropriate because Nationwide has not shown that a Policy term squarely contradicts Pena's misrepresentations. Summary judgment on the issue of vicarious liability is not appropriate because, assuming that Pena was a soliciting agent, the misrepresentations appear to fall within the natural scope of authority of a soliciting agent. Finally, summary judgment on the statute of limitations is not appropriate because Pena's statements in 2000 and 2004, Pena's relationship with Melvin, the failure of Nationwide to cancel the policies even though no payment was made from 2000 to 2004, and Nationwide's failure to send premium notices for Evelyn's Policy until 2008 create a reasonable inference that the three statute of limitations was not violated.

Accordingly, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is DENIED.

IT IS SO ORDERED.

**Dated:    March 17, 2010**                    /s/ Anthony W. Ishii
                                              CHIEF UNITED STATES DISTRICT JUDGE